CHRISTY J. KWON, CA BAR 217186
MARTA NOVOA, CA BAR 292487, Counsel for Service
National Labor Relations Board, Region 20
901 Market Street, Suite 400
San Francisco, California 94103-1735
Telephone Number: (628) 221-8865
FAX: (415)356-5156
E-mail address: marta.novoa@nlrb.gov

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILL H. COFFMAN, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>               Petitioner,<br><br>   vs.<br><br>QUEEN OF THE VALLEY MEDICAL CENTER,<br><br>               Respondent. | Civil No.<br><br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED [29 U.S.C. SECTION 160(j)] |

Memorandum of Points and Authorities In Support of Temporary Injunction

TABLE OF CONTENTS

I.   STATEMENT OF THE CASE.................................................................................... 1

II.  STATUTORY SCHEME....................................................................................... 4

III. ARGUMENT – INTERIM RELIEF IS "JUST AND PROPER"............................... 5

    A.   Petitioner Has a Strong Likelihood of Success on the
           Merits ...................................................................................................... 5

        1.   Petitioner Will Likely Succeed in Obtaining an
              Eventual Board Order Finding Respondent
              Unlawfully Withdrew Recognition from the Union. ............................ 7

              a.   The Board Certified the Union as the Representative of Bargaining Unit
                      Employees After Which Respondent Bargained Unconditionally with the
                      Union. .................................................................................................7
              b.   Board Will Likely Find that Respondent Recognized the Union through
                      its Conduct and Thus Unlawfully Withdrew Recognition...................... 10
              c.   Respondent Has Admitted to Additional Violations of Sections 8(a)(1)
                      and (5) and Its Asserted Defense Will Fail. .............................................. 14

        2.   Board Will Likely Find That Respondent
              Unlawfully Discriminated Against Union Supporter
              Miguel Arroyo ................................................................................ 15

    B.   Respondent's Conduct Has Caused Deleterious Effects on
           Employees' Choice and Increased Employee Disaffection.
           Irreparable Harm Will Likely Occur Absent Injunctive
           Relief.................................................................................................. 18

        1.   Respondent's Withdrawal of Recognition Is
              Causing Irreparable Injury to Union's Ability to
              Represent Employees and Has Deprived Employees
              of Representation By Their Elected Union................................ 19

        2.   Respondent's Discrimination Is Causing Irreparable
              Harm to Employees' Ability to Exercise Section 7
              rights ............................................................................................ 23

    C.   The Balance of Hardships Weighs in Favor of Relief ......................... 24

    D.   The Public Interest Supports Enjoining Respondent's
           Conduct ............................................................................................... 25

IV. CONCLUSION.................................................................................................. 25

TABLE OF AUTHORITIES

**FEDERAL CASES**

1.    *Abbey's Transp. Servs, Inc. v. NLRB*, 837 F.2d 575 (2d Cir. 1988) ................................ 23

2.    *Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127 (9th Cir. 2011) .................................................................................................................. 5

3.    *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401 (1940) ................................................ 11

4.    *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367 (11th Cir. 1992)............................ 21

5.    *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990) ................................................................................................ 21

6.    *Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23 (1st Cir. 1986)................................ 21

7.    *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) ........................... 22, 23

8.    *Brooks v. NLRB*, 348 U.S. 96 (1954) .................................................................... 11

9.    *Brown v. Pac. Tel. & Tel.*, 218 F.2d 542 (9th Cir. 1955) ..................................... 20

10.   *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)................................................................................. 5

11.   *Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995 (7th Cir. 2000) ...................................................................................... 22

12.   *Fall River Dyeing & Finishing v. NLRB*, 482 U.S. 27 (1987) ......................................... 11

13.   *Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011)................................................. passim

14.   *Frankl v. HTH Corp.*, 693 F.3d 1051 (9th Cir. 2012).................................................. 21

15.   *Garcia v. Fallbrook Hosp. Corp.*, 952 F.Supp.2d 937 (S.D. Cal. 2013)................................................................................. 12

16.   *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F.Supp.2d 1201 (E.D. Cal. 2010)........................................................................ 20, 21

17.   *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980)..................................... 24

18.   *Kinney v. Cook Cnty. Sch. Bus, Inc.*, 2000 WL 748121 (N.D. Ill. 2000) ......................................................................................... 20

19.   *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008)............................... 23

20.   *Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386 (S.D.N.Y. 2003) ......................................................................................... 23

21.   *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) ............................... 4, 6, 18, 25

22.   *Moore-Duncan v. Horizon House Dev. Serv.*, 155 F.Supp.2d 390 (E.D. Pa. 2001) ......................................................................... 20, 22

23.   *Muffley v. Spartan Mining Co.*, 570 F.3d 534 (4th Cir. 2009) .................................. 23, 24

24.   *Int'l Union of Elec., Radio and Mach. Workers v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243 (D.C. Cir. 1970) ............................ 21, 22

25.   *NLRB v. Electro-Voice, Inc.*, 83 F3d 1559 (7th Cir. 1996) ...................... 6, 10, 24

26.   *NLRB v. Irving Ready-Mix, Inc.*, 780 F.Supp.2d 747 (N.D. Ind. 2011) .......................................................... 20

27.   *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1974) ......................................... 13

28.   *NLRB v. Transp. Mgmt.*, 462 U.S. 393 (1983) ........................................ 16, 17

29.   *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149 (1956) ............................................. 13

30.   *NLRB v. Whitin Mach. Works*, 217 F.2d 593 (4th Cir. 1954) .......................................... 13

31.   *Norelli v. Fremont-Rideout Health Grp.*, 632 F.Supp.2d 993 (E.D. Cal. 2009) ............................................................. 24

32.   *Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994) ............................................................. 16

33.   *Overstreet v. Thomas Davis Med. Ctr.s, P.C.*, 9 F.Supp.2d 1162 (D. Ariz. 1997) ......................................................................... 24

34.   *Pascarell v. Gitano Grp., Inc.*, 730 F.Supp. 616 (D. N.J. 1990) ...................................... 23

35.   *Penello v. United Mine Workers*, 88 F.Supp. 935 (D. D.C. 1950) ............................... 24

36.   *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146 (1941) ............................. 14

37.   *Pye v. YWCA of W. Mass.*, 419 F.Supp.2d 20 (D. Mass. 2006) ...................................... 20

38.   *Scott v. Stephen Dunn & Associates*, 241 F.3d 652 (9th Cir. 2001) ......................... passim

39.   *Scott v. Toyota of Berkeley, Inc.*, 106 LRRM 2070 (N.D. Cal. 1980) ................................. 23

40.   *McDermott v. Dura Art Stone, Inc.*, 298 F. Supp. 2d 905 (C.D. Cal. 2003) ......................................................... 24

iii          Memorandum of Points and Authorities In Support of Temporary Injunction

41.  *Seeler v. Trading Port, Inc.*,
     517 F.2d 33 (2d Cir. 1975).................................................................... 24

42.  *Small v. Avanti Health Sys., LLC*,
     661 F.3d 1180 (9th Cir. 2011) ..................................................... passim

43.  *Squillacote v. Generac Corp.*,
     304 F.Supp. 435 (E.D. Wis. 1969)..................................................... 23

44.  *Technicolor Gov't Serv.s v. NLRB*,
     739 F.2d 323 (8th Cir. 1984) ........................................................ 11, 12

45.  *Traction Wholesale Ctr. Co. v. NLRB*,
     216 F.3d 92 (D.C. Cir. 2000) ............................................................. 16

46.  *Univ. of Tex. v. Camenisch*,
     451 U.S. 390 (1981) ............................................................................ 6

47.  *Wells Fargo Armored Serv.s Corp.*,
     322 NLRB 616 (1996) ...................................................................... 16

48.  *Winter v. Natural Res. Def. Council, Inc.*,
     555 U.S. 7, 129 S. Ct. 365 (2008).......................................................... 5

49.  *Zipp v. Bohn Heat Transfer Grp.*,
     110 LRRM 3013 (C.D. Ill. 1982) ..................................................... 23

**NLRB DECISIONS**

50.  *Audio Visual Servs Grp.*, 365 NLRB No. 84 (2017) ........................ 11

51.  *Austal USA, LLC*, 356 NLRB No. 65 (2010)................................... 16

52.  *Benchmark Indus.*, 262 NLRB 247 (1982) ...................................... 12

53.  *Benjamin H. Realty Corp.*, 362 NLRB No. 181 (2015)..................... 14

54.  *Chelsea Indus.*,
     331 NLRB 1648 (2000) .................................................................... 11

55.  *IBM Corp.*,
     341 NLRB 1288 (2004) .................................................................... 13

56.  *King Radio Corp.*,
     166 NLRB 649 (1967) ...................................................................... 12

57.  *Lucky Cab Co.*,
     360 NLRB No. 43 (2014) .................................................................. 17

58. *MaxPak*,
    362 NLRB No. 138, slip op. at 1 (2015) ............................................. 12

59. *Michael Konig*,
    318 NLRB 901 (1995) ........................................................................ 12

60. *Mid-Mountain Foods*,
    332 NLRB 251 (2000) ........................................................................ 17

61. *Prof'l Transp., Inc.*,
    326 NLRB No. 60 (2015) ................................................................... 12

62. *Puna Geothermal Venture*,
    362 NLRB No. 133 (2015) ................................................................. 14

63. *Wells Fargo Armored Services Corp.*,
    322 NLRB 616 (1996) ........................................................................ 16

64. *Wright Line*,
    251 NLRB 1083 (1980) ...................................................................... 16

65. *Zipp v. Bohn Heat Transfer Grp.*,
    110 LRRM 3013 (C.D. Ill. 1982) ...................................................... 23

**STATUTES**

66. 28 U.S.C. § 1391 (b)(c) ......................................................................... 1

67. 29 U.S.C. § 160(j) ........................................................................... i, 1, 4

68. 29 U.S.C. § 157 ..................................................................................... 4

69. 29 U.S.C. §§ 158(a)(5), 158(d) ......................................................... 11

70. 28 U.S.C. § 1657(a) .............................................................................. 1

**OTHER AUTHORITIES**

71. S. Rep. No. 80-105, at 8, 27 (1947) ..................................................... 4

v                    Memorandum of Points and Authorities In Support of Temporary Injunction

## I.      STATEMENT OF THE CASE

This proceeding is before the Court on a Petition for a Temporary Injunction filed by Petitioner Jill H. Coffman, the Regional Director of Region 20 of the National Labor Relations Board (Board), pursuant to Section 10(j)[1] of the National Labor Relations Act, as amended [29 U.S.C. §160(j)] (the Act). Section 10(j) empowers this Court to grant an interlocutory injunctive order pending the Board's final disposition of the underlying administrative Consolidated Complaint, as amended (the Complaint) (GC Exh. 1(s), 1(v), 1(y))[2] and entry of a final remedial order against Queen of the Valley Medical Center (Respondent). This matter warrants expedited consideration by the Court pursuant to 28 U.S.C. § 1657(a).[3]

---

[1]   Section 10(j) provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States District Court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. 29 U.S.C. §160 (j)

[2]   Reference to exhibits filed with this Court in support of the Memorandum of Points and Authorities shall be made as follows:

Exhibit A, the Official Transcript of Proceedings before the Board on the Charges (the Administrative Proceeding), shall be referred to as "Tr." followed by the corresponding transcript page numbers;

Exhibit B, C, D, and E, respectively Joint, Petitioner's (as General Counsel), Respondent's and Charging Party exhibits received into evidence by the Administrative Law Judge in the Administrative Proceeding shall be referred to as "GC Ex.," "R. Ex.," and "CP Ex.," respectively, followed by the corresponding exhibit numbers with page references where appropriate.

Exhibit F and G, respectively the April 28, 2017 and June 5, 2017 Affidavits of Hilda Poulson filed in support of this Petition, shall be referred to as "Ex. F" and "Ex. G" followed by the internal page number.

[3]   The United States District Court, Northern District of California is the proper venue since Respondent's facilities at issue in this case are located in Napa, California, which falls within Northern District.  See 28 U.S.C. § 1391 (b)(c).

Such restraint is necessary now to prevent the irreparable harm likely to result from Respondent's ongoing unlawful conduct, principally Respondent's decision to cease recognizing and bargaining with the National Union of Healthcare Workers (Union), despite the fact that a majority of Respondent's employees had decisively voted for the Union to represent them in collective-bargaining, a vote which the Board certified, and despite the fact that Respondent had already begun bargaining unconditionally with the Union. The Board calls this type of violation of Section 8(a)(5) of the Act a *withdrawal of recognition*. This type of violation is very different from an employer *withholding recognition* while it challenges the results of the union election through an established procedural mechanism called a *technical refusal to bargain*.[4]

Although Respondent will argue it was doing the latter, it is legally and procedurally incorrect under Board precedent. Respondent should have timely announced its intention to withhold recognition and bargain conditionally while it challenged the Board's certification of the bargaining representative. It was obligated to do so in order to preserve its ability to challenge the certification before a circuit court. However, it did not. Instead, Respondent engaged in a course of conduct that included its management team complying with statutory obligations, like notifying and bargaining with the Union over changes to bargaining unit employees' terms and conditions of employment and furnishing the Union with requested information relevant to its representational duties, without attaching any conditions. Respondent's announcement that it was withholding recognition and offering to conditionally bargain while it tested certification came nearly three months after the Board certified the Union

---

[4] Board law often refers to this as a "test of certification" that is procedurally achieved through an employer's "technical" violation of Section 8(a)(5) of the Act. That is, employers technically violate their duty to recognize and bargain with the Union in an attempt to re-litigate before a circuit court, the Board's certification of election results. The Board recognizes a clear distinction between that and an employer's unlawful withdrawal of recognition.

on December 22, 2016, and a full two weeks after the Board denied Respondent's request for review of that certification. In short, it was untimely and insufficient. Under Board law, Respondent is deemed to have "recognized" the Union by engaging in unconditional bargaining with the Union after certification, and any attempt to withhold recognition after that point, constitutes an unlawful withdrawal of recognition. Respondent will likely continue to argue it has not recognized the Union and is merely engaged in a technical refusal to bargain by citing to a line of Board cases regarding "voluntary recognition." However, the Court should reject this line of cases, as voluntary recognition arises where there has been no Board certification. Accordingly, this line of cases is inapplicable here where there the Union is a Board-certified bargaining representative.

To prevent irreparable harm caused by its blatant violation of the Act, Respondent must be temporarily enjoined from refusing to recognize and bargain with the Union and from all related conduct that accompanies a withdrawal of recognition, as well as from discriminating against employees. This includes enjoining Respondent from: refusing to bargain over bargaining unit employees' working conditions, making unilateral changes to bargaining unit employees' terms and conditions of employment without providing the Union notice and opportunity to bargain, denying bargaining unit employees' rights to Union representation at investigatory meetings, refusing to furnish requested information to the Union, repudiating a signed agreement, and changing the work schedule of Union supporters, and to restore the status quo.

As fully set forth in this Memorandum, injunctive relief is necessary now to preserve the employees' fundamental right under Section 7 of the Act "to bargain collectively through representatives of their own choosing" and to prevent Respondent from benefitting from its

unlawful action by ignoring its employees' choice. 29 U.S.C. § 157. The injunction, if granted, would only be in place until a Board orders a final remedial order because the purpose of such an injunction is to preserve the Board's remedial authority, and to prevent Respondent from achieving its unlawful objective in the meantime. A hearing on the allegations in the Complaint opened before an Administrative Law Judge on August 7, 2017[5] and continued through August 11 before recessing and reconvening August 23 through August 25. The hearing is set to resume on October 11 to complete Respondent's case-in-chief, but the Board's final review of these proceedings likely will not conclude for a period of a year or more. Congress added Section 10(j) to the Act to provide a mechanism for avoidance of the irreparable harm attendant to such delay in appropriate cases, such as this one.

## II.    STATUTORY SCHEME

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions that are "just and proper" pending the Board's resolution of unfair labor practice proceedings. 29 U.S.C. § 160(j). Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint. *See Scott v. Stephen Dunn & Associates,* 241 F.3d 652, 659 (9th Cir. 2001) (herein *Stephen Dunn*); *Miller v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 455 n.3 (9th Cir. 1994) (*en banc*) (quoting S. Rep. No. 105, 80th Cong., 1st Sess. at 8, 27 reprinted in 1 Leg. Hist. 414, 433 (LMRA 1947)).

In the Ninth Circuit, district courts rely on "traditional equitable criteria through the prism of the underlying purpose of Section 10(j), which is to protect the integrity of the collective-bargaining process and to preserve the Board's remedial power." *Small v. Avanti*

---

[5] All dates herein refer to 2017 unless otherwise specified.

*Health Sys., LLC,* 661 F.3d 1180 (9th Cir. 2011) (herein *Avanti Health Sys.*)*; Frankl v. HTH Corp.,* 650 F.3d 1334, 1355 (9th Cir. 2011) (herein *HTH Corp.*) *cert. denied*, 132 S.Ct. 1821 (2012). Thus, to obtain a preliminary injunction, the Petitioner must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of hardships tips in the Board's favor; and (4) that an injunction is in the public interest. *HTH Corp.,* 650 F.3d at 1355 *(*citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S. Ct. 365, 374 (2008)). These elements are evaluated on a "sliding scale" in which the required showing of likelihood of success decreases as the showing of irreparable harm increases. *See Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1131-34 (9th Cir. 2011). When "the balance of hardships tips sharply" in the Petitioner's favor, the Director need only establish that "serious questions going to the merits" exist, so long as there is a likelihood of irreparable harm and the injunction is in the public interest. *HTH Corp.*, 650 F.3d at 1355 (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135). The "serious questions" standard permits a district court to grant an injunction where it "cannot determine with certainty that the [Director] is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1133 (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

## III.    ARGUMENT – INTERIM RELIEF IS "JUST AND PROPER"

### A.    Petitioner Has a Strong Likelihood of Success on the Merits

Likelihood of success in a Section 10(j) proceeding "is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that the Ninth Circuit would grant a petition enforcing that order." *HTH Corp.*, 650 F.3d at 1355; *see also Avanti Health Sys.*, 661 F.3d at 1187. In evaluating the

likelihood of success, "it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *HTH Corp.,* 650 F.3d at 1356 (quoting *Miller,* 19 F.3d at 460). Petitioner need not prove that the respondent committed the alleged unfair labor practices by a preponderance of the evidence as required in the underlying administrative proceeding. *See Stephen Dunn,* 241 F.3d at 662. Such a standard would "improperly equat[e] 'likelihood of success' with 'success.'" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981).

Rather, Petitioner demonstrates likelihood of success by producing "some evidence" in support of the unfair labor practice charge "together with an arguable legal theory." *Avanti Health Sys.,* 661 F.3d at 1187 (quoting *HTH Corp.*, 650 F.3d at 1356); *see also Stephen Dunn*, 241 F.3d at 662 (the Regional Director need only show "a better than negligible chance of success"). Therefore, in a Section 10(j) proceeding, the district court should sustain the Regional Director's factual allegations if they are "within the range of rationality" and, "[e]ven on an issue of law, the district court should be hospitable to the views of the [Regional Director], however novel." *HTH Corp.*, 650 F.3d at 1356. Credibility conflicts in evidence "do[] not preclude the Petitioner from making the requisite showing for a section 10(j) injunction," and there is no need for district courts to resolve them. *Stephen Dunn*, 241 F.3d at 662 ("A conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction."); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570-71 (7th Cir. 1996) (herein *Electro-Voice, Inc.*).

As discussed below, Petitioner has a strong likelihood of proving that Respondent unlawfully withdrew recognition from the Union in violation of Section 8(a)(5). Because Respondent unlawfully withdrew recognition from the Union, it also unlawfully denied an

employee access to a Union representative during an investigatory interview in violation of Section 8(a)(1), and it violated Section 8(a)(5) by refusing to furnish the Union relevant requested information, making unilateral changes to bargaining unit employees' terms and conditions of employment, and repudiating a signed agreement between the parties. Petitioner also has a strong likelihood of success to establish Respondent unlawfully discriminated against a Union supporter in violation of Section 8(a)(3).

       1.       **Petitioner Will Likely Succeed in Obtaining an Eventual Board Order Finding Respondent Unlawfully Withdrew Recognition from the Union.**

            a.      The Board Certified the Union as the Representative of Bargaining Unit Employees After Which Respondent Bargained Unconditionally with the Union.

Respondent operates an acute-care hospital and several outpatient medical facilities at its campus in Napa, California. (GC Ex. 1(s)(¶2(a)), 1(u)(¶2(a)); Jt. Ex. 3) On October 4, 2016, the Union filed a petition for a representation election for a unit of approximately 419 of Respondent's nonprofessional and technical employees. (Tr. 56; Jt. Ex. 1( ¶6), 2) On November 15, 2016, Region 20 of the Board held a mail ballot count for the Union's representation petition. (Jt. Ex. 1(¶7)) Over 90 percent of the bargaining unit returned mail ballots, and the ballots reflected a decisive victory for the Union by a wide margin. (Jt. Ex. 1(¶8), 4) On December 22, 2016, the Regional Director overruled Respondent's objections to the election and certified the Union as the exclusive collective-bargaining representative of the petitioned-for unit.  (Jt. Ex. 1(¶10), 6) Respondent filed a request for review to the Board to challenge the election results, which the Board denied on February 28. The Board confirmed the Union's certification as the employees' elected bargaining representative, effective December 22, 2016. (Jt. Ex. 1(¶11), 7, 8)

      After the Union's certification as the bargaining representative, Respondent began complying with its statutory obligations under the Act. When bargaining unit employee, Jennifer

Mini-Bera, requested to have a Union representative present during an investigatory interview that could lead to discipline, Respondent, by Administrative Director of Laboratory and Pathology Olive Romero, agreed to honor that request and worked with Union Representative Hilda Poulson to schedule the interview. (Tr. 40, 100, 102, 193-198, 204; Jt. Ex. 1(¶¶32, 39), 29, 36) Respondent also began notifying the Union of upcoming changes to bargaining unit employees' working conditions, including workforce reductions, schedule changes, and the temporary closure of Respondent's kitchen and cafeteria facilities. (Tr. 77-78, 98, 117-118, 200, 1491, 1496; Jt. Ex. 1(¶¶17, 22, 33), 17-18, 30; GC Ex. 13)

The Union requested to meet and bargain over these local operational issues and others, and Respondent agreed. (Tr. 71, 80, 84, 99, 106-107, 112, 116-117, 200; Jt. Ex. 1(¶¶14-15, 18, 23, 26), 14(a)-(b), 16, 19; GC Ex. 6, 10) The parties held six separate meetings in which they discussed Respondent's notifications and proposed changes and otherwise bargained over the effects on the terms and conditions of employment of bargaining unit employees. (Tr. 70, 79, 89, 94-95, 99, 118-119, 121-122, 857, 859, 1070-1072, 1331, 1485, 1510; Jt. Ex. 1 (¶¶19-20, 25-26, 31)) In the course of bargaining over these subjects, the Union requested information relevant and necessary to its role as the employees' representative, and Respondent provided responsive information to the Union. (Tr. 72, 79, 92, 99-100, 122, 1556-1557; Jt. Ex. 1 (¶¶20, 22, 23), 16-19; GC Ex. 15) For instance, after meeting and bargaining over the effects of the kitchen closure on January 24, Poulson sent Director of Employee Advocacy and Labor Relations Bill Candella an email requesting specific information relevant to the Union in formulating its proposal, most of which Respondent promptly provided. (Tr. 82, 84-85, 90-92, 95, 1506, 1556-1557; Jt. Ex. 1 (¶20), 16, 23; GC Ex. 8) Through the bargaining process, the parties exchanged several drafts of an agreement to govern the effects of the temporary kitchen and cafeteria closure and eventually

reached a signed agreement which was ratified by the affected employees. (Tr. 86, 89-90, 93-94, 96-97, 1510, 1555, 1573, 1575-1576; Jt. Ex. 1 (¶21, 24-25, 28-29, 31), 16, 20, 23-25, 28; GC Ex. 9) While Respondent was recognizing the Union, members of management reserved private space at Respondent's facilities for the Union to conduct Union business, including bargaining team meetings and the ratification vote for the kitchen and cafeteria closure agreement reached by Respondent and the Union. (Tr. 66-68, 127-128; Jt. Ex. 1(¶ 40); GC Ex. 5)

During this period of recognition, the Union requested to bargain not only the local operational issues, but also a first contract. To that end, on January 10, the Union, by Assistant to the President Dan Martin, sent Respondent a letter requesting bargaining unit information for the purposes of preparing for first contract bargaining. (Tr. 137-138; Jt. Ex. 1(¶16), 12) Respondent provided extensive information in response to the Union's requests and offered to continue to bargain in good faith over the requests for which Respondent had not provided information or contested the scope of the Union's request. (Tr. 139-141, 144-145, 159, 1543-1546; Jt. Ex. 1(¶¶27, 30), 21, 22, 27, 31, 31(a)) Respondent, by Candella, further discussed the provision of the information with the Union on several occasions to determine whether the Union preferred the information provided all at once or piecemeal. (Tr. 126, 141-142, 145, 1450; Jt. Ex. 27, 31) On March 1, Martin spoke with Candella by phone and notified him that he would be sending over proposed dates for first contract bargaining, which he did later that day. (Tr. 143-144, 1530, 1532; Jt. Ex. 1(¶35), 32) At no point during any of these bargaining sessions, exchanges of information, or other communication did Respondent express to the Union that its actions vis-à-vis the Union were subject to any conditions. (Tr. 78, 82, 91-92, 126, 1491, 1499, 1509, 1532, 1560-1561)

On March 16, Respondent's abruptly changed its course. On that date, Respondent, by Senior Labor and Employment Counsel Michael Garrison, sent the Union a letter asserting -- for the first time -- that absent the Union agreeing to a re-run election, Respondent would engage in a technical refusal to bargain in order to test the unit certification. (Jt. Ex. 34) Respondent then offered, again, for the first time, to bargain conditionally for a first contract pending the outcome of Respondent's test of certification case. (Jt. Ex. 34) Then on March 24, Respondent, by Human Resources Director Schelling, sent an email, following up on the Union's request to continue bargaining over local operational issues. (Jt. Exh. 37) Schelling's email reiterated Respondent's position from the March 16 letter and noted absent an "alternative arrangement," Respondent refused to meet and bargain with the Union. (Id.) After threatening to withdraw recognition on March 16, Respondent effectively withdrew recognition March 24 by refusing to continue to meet and bargain unconditionally. (Tr. 105-106, 128-129, 131-132; 936-937; Jt. Ex. 34, 37, 38; GC Ex. 17) Since this date, Respondent also implemented unilateral changes to employees' working conditions, rescinded the signed kitchen agreement, ceased granting the Union access to private meeting spaces, denied employees' their rights to have a representative present during an investigatory interview, and stopped providing information in response to the Union's requests. (Tr. 103-106, 128-129, 131-133, 203, 844-845; Jt. Ex. 36, 38; GC Ex. 1(u), 17) Respondent has only now conditioned bargaining with the Union by expressing that absent the Union agreeing to the terms in the March 16 letter, Respondent would not meet with the Union or give effect to the signed agreement on the effects of the kitchen closure. (Jt. Ex. 37, 38)

> b.     Board Will Likely Find that Respondent Recognized the Union through its Conduct and Thus Unlawfully Withdrew Recognition.

Sections 8(a)(5) and 8(d) of the Act prohibit an employer from refusing to bargain collectively in good faith with its employees' bargaining representative and require employers to

meet at reasonable times and to confer in good faith with its employees' bargaining representative regarding terms and conditions of employment. 29 U.S.C. §§ 158(a)(5), 158(d). Board certification of a bargaining representative or union, by operation, establishes that the union is the employees' elected bargaining representative and enjoys a conclusive, non-rebuttable presumption of continuing majority support for the year following its certification in order to help promote the goal of industrial peace. *Brooks v. NLRB*, 348 U.S. 96, 98-99 (1954). *See also Fall River Dyeing & Finishing v. NLRB*, 482 U.S. 27, 37 (1987); *Chelsea Indus.*, 331 NLRB 1648, 1648 (2000), *enfd.* 285 F.3d 1073 (D.C. Cir. 2002) ("To foster collective bargaining and industrial stability, the Board has long held that a certified union's majority status ordinarily cannot be challenged for a period of one year.") And since under the Act, Board certification is not an "order" subject to judicial review, if an employer intends to seek further review of a Board-issued certification, it may only do so by refusing to bargain upon the union's certification.[6]

However, an employer who intends to pursue this type review must state so clearly to the union. An employer is not relieved of its statutory obligations vis-à-vis its employees' certified union pending Board consideration of a request for review. *Audio Visual Services Grp.*, 365

---

[6] *See Am. Fed'n of Labor v. NLRB*, 308 U.S. 401 (1940).

The procedural course to "test certification" in order to obtain judicial review is clearly set forth in *Technicolor Gov't Services v. NLRB*, 739 F.2d 323, 326 (8th Cir. 1984), *enfing*, 268 NLRB 258 (1983):

In order to challenge certification of a collective bargaining unit, an employer must refuse to recognize a union after its certification.  If the union files unfair labor practice charges for refusal to bargain, under [Section] 8(a)(5) of the Act, the employer may then raise the issue of the propriety of the unit as an affirmative defense to the charges.  An employer then obtains judicial review of a certification determination via review of the unfair labor practice charges…[i]n order to challenge the propriety of a certification, an employer must refuse to recognize a union *immediately* after the collective bargaining unit has been *certified* and the union has been elected as the representative of the bargaining unit. (emphasis added)

NLRB No. 84, slip op. at 2 (2017) (citing *Benchmark Indus.*, 262 NLRB 247, 248 (1982), *enfd. mem.* 724 F.2d 974 (5th Cir. 1984)). Accordingly, an employer engaging the union unconditionally, even if request for review is pending, is complying with its established statutory obligations of recognizing and bargaining with the union. Therefore, an employer who does not intend to honor the Board-issued certification must clearly condition any exchange with its employees' Board-certified representative in order to preserve its claim that it has refused to recognize and bargain with the union. *Technicolor Gov't Services*, 739 F.2d at 326-27. An employer that honors certification and recognizes a bargaining representative by engaging in unconditional bargaining waives its objections to the validity of the certification and may not subsequently attempt to "test certification" by engaging in a technical refusal to bargain. *Id.; King Radio Corp.*, 166 NLRB 649 (1967), *enfd.* 398 F.2d 14, 20 (10th Cir. 1968); *Michael Konig*, 318 NLRB 901, 902 (1995), *enfd..* 1996 WL 199152 (3d Cir. 1995).  *See MaxPak*, 362 NLRB No. 138, slip op. at 1 (2015) (employer waived right to challenge validity of certification when it entered into negotiations with union); *Prof'l Transp., Inc.*, 326 NLRB No. 60, slip op. at 2 (2015) (same). *See also Garcia v. Fallbrook Hosp. Corp.*, 952 F.Supp.2d 937, 953-54 (S.D. Cal. 2013) (same).

It is undisputed that Respondent provided the Union notice of upcoming projects that would affect terms and conditions of employment of some bargaining unit employees and reductions in force affecting others.  Respondent also bargained over and reached a signed agreement governing the effects on bargaining unit employees of a temporary kitchen closure, notified the Union of changes to employees' schedules and bargained with the Union over those proposed changes.  There is no evidence that Respondent conditioned bargaining at the table in any way, or conveyed any conditions to the Union in any of its written communication relating

to bargaining or to the terms and conditions of employment of unit employees.  In fact, Respondent's written communications reflect a willingness to meet, exchange proposals, furnish information, and bargain over other requested information with the Union in "good faith."   (Jt. Ex. 1(¶¶ 27, 29, 34), 22, 23, 24, 31)  Respondent also provided the Union with information the Union requested to fulfill its obligations as the bargaining representative, and Respondent honored an employee's *Weingarten* right to have a Union representative present during an investigatory meeting.[7]  These are obligations that only arise where there is a collective-bargaining relationship between an employer and a union.[8]

Respondent's uncontested conduct whereby it fulfilled its statutory collective-bargaining obligations between the December 22 certification and up until its March 24 was never clearly conditioned on any pending appeal.  Indeed, no communication asserted Respondent's intention to "test certification" until the March 16 letter.  The uncontested conduct constituted recognition of the Union. Any other result would allow employers to recognize and bargain with a union and then unilaterally decide it no longer wishes to, disrupting the kind of industrial peace the Act is designed to promote. Only in its March 16 letter did Respondent first express a plan to test certification and only after March 24 did it refuse to comply with its statutory obligations to

---

[7]   *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1974) (employee has a right to have a union representative present, upon request, during an investigatory interview that an employee reasonably believes may result in discipline).

[8]   The Board has found that *Weingarten* rights do not apply in non-unionized workplaces. *IBM Corp.*, 341 NLRB 1288 (2004).

As to the duty to furnish information, this obligation arises out of the necessity for parties at the bargaining table to have adequate and necessary information to engage in effective bargaining.  *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153 (1956) ("[G]ood faith bargaining necessarily requires that claims made by either bargainer should be honest claims. …If…an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy").  *See also NLRB v. Whitin Mach. Works*, 217 F.2d 593, 594 (4th Cir. 1954), *cert. denied* 349 U.S. 905 (1955) (Union cannot effectively represent employees where it lacks information that "is necessary to the proper discharge of the duties of the bargaining agent").

recognize and bargain with the Union.  Only then did Respondent condition its exchanges with the Union, and only then did it refuse to meet and bargain, to honor *Weingarten* rights, to furnish information, and to notify the Union of unilateral changes that would impact bargaining unit employees' terms and conditions of employment.  By doing so, Respondent ceased recognizing a Board-certified bargaining representative that still enjoyed the presumption of majority support of the bargaining unit employees.  Accordingly, Petitioner has a strong likelihood of success in establishing that Respondent recognized and bargained with the Union prior to March 24, and that by its actions afterwards, it unlawfully withdrew recognition in violation of Section 8(a)(5).

> c.    Respondent Has Admitted to Additional Violations of Sections 8(a)(1) and (5) and Its Asserted Defense Will Fail.

Because it is undisputed that after March 24 Respondent made unilateral changes to working conditions, refused to bargain with the Union, refused to furnish the Union with requested information, and refused to honor employees' *Weingarten* rights, Petitioner will likely prevail on these Section 8(a)(1) and (5) allegations.  Respondent defends these unfair labor practices by asserting the Union was improperly certified.  (GC Ex. 1(u), 1(x), 1(dd))  However, the Board has already reviewed and rejected Respondent's basis for objection to the Board-issued certification in the representation proceeding and will do so again in the present unfair labor practice proceeding.  (Jt. Ex. 1(¶12), 8)  *See, e.g.*, *Benjamin H. Realty Corp.*, 362 NLRB No. 181, slip op. at 2 (2015) citing *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162 (1941).  The Board has rejected an improper-certification defense in other cases where an employer's only asserted defense for such unfair labor practices is that the union was improperly certified by the Board.  *See, e.g.*, *Puna Geothermal Venture*, 362 NLRB No. 133 (2015) (employer unlawfully refused to furnish presumptively relevant information concerning terms and conditions of employment of unit employees where it defended its actions solely based on a

rejected argument that the union was improperly certified).  Accordingly, the likelihood of success on these allegations weighs heavily in Petitioner's favor.

### 2.  Board Will Likely Find That Respondent Unlawfully Discriminated Against Union Supporter Miguel Arroyo

During the Union's organizing campaign leading up to the election, there were several departments that were particularly active in their support for the Union.  (Tr. 58-59)  Among the most active departments was the housekeeping department, known as Environmental Services (EVS).  (Tr. 59)  EVS employees participated in circulating the organizing petition, wearing pro-Union paraphernalia, and distributing these items to their coworkers.  (Tr. 57-59; GC Ex. 2(a)-(b))  EVS employees were featured in several videos, flyers, and posts on the Union's public Facebook page for its campaign at Respondent, "Queen Workers for NUHW."  (Tr. 60-62, 64-65; GC Ex. 3, 4)

In late October 2016, EVS employee Miguel Arroyo was featured in a Union Facebook post indicating he would be voting in favor of Union representation.  (Tr. 64-65; GC Ex. 4)  EVS Director Kevin Herring, having thought he had a good handle of how his department employees were voting, believed Arroyo was voting against Union representation and was disappointed when he learned otherwise.  (Tr. 727-728)  Over the course of several conversations with EVS Supervisor Sherri Roe in early November, during which former Groundskeeper Ardy Van Winden was present, Herring indicated he intended to change Arroyo's schedule in order to make it "hurt" for supporting the Union.  (Tr. 729-730)  The schedule change would be a personal hardship for Arroyo and his family because, as Roe pointed out to Herring, the family only had one vehicle.  (Tr. 730-731; R Ex. 25)  Herring indicated he planned to use Respondent's policy prohibiting employment of relatives on the same shift as cover for reassigning Arroyo, who had been working on the same shift as his wife, also an EVS employee, for some time.  (Tr.

514, 517, 729-730; R Ex. 24)  On November 7, Respondent notified Arroyo that he would be reassigned to the first shift starting on November 15.  (Tr. 517-518; R Ex. 25)

Under these facts, Petitioner also has a strong likelihood of proving that Respondent unlawfully retaliated against a Union supporter in violation of Section 8(a)(3) by changing his schedule after learning of his Union activity.  In these cases, the Board applies the *Wright Line* analytic framework.  *Wright Line*, 251 NLRB 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), *cert denied* 455 U.S. 989 (1982).  Under this framework, the General Counsel must show the employee was engaged in protected activity, the employer had knowledge of that activity, and the employer's hostility to that activity "contributed to" its decision to take an adverse action against the employee.  *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 278 (1994), clarifying *NLRB v. Transp. Mgmt.*, 462 U.S. 393, 395, 403 n.7 (1983); *Wright Line*, 251 NLRB at 1089.  General Counsel may establish the discriminatory motive through evidence of:  (1) statements of animus directed to the employee or about the employee's protected activity[9]; (2) statements by the employer that are specific as to the consequences of protected activities and are consistent with the actions taken against the employee[10]; (3) close timing between discovery of the employee's protected activities and the adverse action[11]; (4) the existence of other unfair labor practices that demonstrate that the employer's animus has led to

---

[9] *See, e.g., Austal USA, LLC*, 356 NLRB No. 65, slip op. at 1 (2010) (unlawful motivation found where Human Resources director interrogated and threatened union activist and supervisors told activist that management was "after her" because of her union activities).

[10] *See, e.g., Wells Fargo Armored Services Corp.*, 322 NLRB 616, 616 (1996) (unlawful motivation found where employer unlawfully threatened to discharge employees who were still out in support of strike and then disciplined an employee who remained out following the threat).

[11] S*ee, e.g., Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000) (immediately after employer learned that union had obtained authorization cards from a majority of employees, it fired an employee who had signed a card).

unlawful actions[12]; or (5) evidence that the employer's asserted reason for the adverse action was pretextual, e.g., disparate treatment of the employee.[13]  An employer may rebut the General Counsel's case by establishing, as an affirmative defense, that Respondent would have taken the same adverse action even in the absence of the protected activity.  *See NLRB v. Transp. Mgmt.*, 462 U.S. at 401 ("the Board's construction of the statute permits an employer to avoid being adjudged as a violator by showing what his actions would have been regardless of his forbidden motivation").

In the present case, there is evidence that EVS employee Miguel Arroyo engaged in protected activity and supported the Union by appearing in a pro-Union picture posted on the Union's "Queen Workers for NUHW" Facebook page.  Former Groundskeeper Van Winden testified that Respondent, by EVS Director Herring, knew of Arroyo's Union support after seeing the Facebook post on the Union's page.  Van Winden's testimony further establishes that shortly after learning of Arroyo's Union support, Herring changed Arroyo's schedule, causing him to lose the shift differential pay and in order to "make it hurt" because Arroyo was pro-Union.  There is also evidence that Respondent used its employment of relatives policy as a pretext to discriminate.  Respondent knew the Arroyos were married and working on the same shift well before November, but it did not enforce the policy against them until after it learned of

---

[12] *See, e.g.*, *Mid-Mountain Foods*, 332 NLRB 251, 251 n.2, passim (2000), *enfd. mem.* 11 Fed. Appx. 372 (4th Cir. 2001) (relying on prior Board decision regarding respondent and, with regard to some of the alleged discriminatees, relying on threatening conduct directed at the other alleged discriminatees)

[13] *See, e.g.*, *Lucky Cab Co.*, 360 NLRB No. 43 (2014).

his Union support.  This is sufficient evidence to establish Petitioner's likelihood of success on the merits under the statutory scheme and relevant precedent in this type of proceeding.[14]

### B.   Respondent's Conduct Has Caused Deleterious Effects on Employees' Choice and Increased Employee Disaffection.  Irreparable Harm Will Likely Occur Absent Injunctive Relief

It is "just and proper" for this Court to preserve Respondent's employees' fundamental Section 7 right to freely choose their collective-bargaining representative by enjoining, pending a final Board order, Respondent's continued unlawful conduct. Indeed, the purpose of Section 10(j) is "to protect the integrity of the collective-bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller*, 19 F.3d at 459-60.  District courts must "take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Id. See also Avanti Health Sys.*, 661 F.3d at 1191*; HTH Corp.*, 650 F.3d at 1362.

Likely irreparable harm is established in a Section 10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *HTH Corp.*, 650 F.3d at 1362. The Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring[15] or from available "inferences from the nature of the particular unfair labor practice at issue." *HTH Corp.*, 650 F.3d at 1362. The same evidence and legal conclusions establishing likelihood of success, together with permissible inferences regarding the likely interim and long-run impact of the likely unfair labor practices, provide support for a finding of irreparable harm. *Avanti Health Sys.*, 661 F.3d at

---

[14]  Respondent may argue that its witnesses have denied Van Winden's testimony; however, resolution of these disputed facts rely on credibility determinations, which, as noted, need not be resolved in this proceeding.

[15] *See*, *e.g.*, *Stephen Dunn*, 241 F.3d at 667-68.

1191, quoting *HTH Corp.*, 650 F.3d at 1362 (in withdrawal of recognition context; "inferences from the nature of the particular unfair labor practice at issue remain available. With regard to the central statutory violations of Section 8(a)(5), such as failure to bargain in good faith, has long been understood as likely causing an irreparable injury to union representation").

> 1.     **Respondent's Withdrawal of Recognition Is Causing Irreparable Injury to Union's Ability to Represent Employees and Has Deprived Employees of Representation By Their Elected Union**

In January, the bargaining unit employees elected around 30 bargaining team members to represent them in first-contract negotiations. (Ex. G 2)  In January through March, the Union held monthly bargaining team meetings at Respondent's facility and approximately 30 unit members attended. (Ex. G 2)  After Respondent's withdrawal of recognition in March, employee attendance at the bargaining team meetings fell to 14 in April and a mere 12 employees were in attendance at the May meeting. (Ex. G 2)  The employees who have attended these meetings have expressed frustration at the Union for its ineffectiveness at representing them and stated it was becoming harder to maintain co-workers' support for the Union. (Ex. F 7-8; Ex. G 2, 10) Bargaining team members informed the Union they feared retaliation by Respondent and were not willing to "stick their necks out" for the Union, and, indeed, some have already resigned their bargaining team positions or even their employment at Respondent. (Ex. G 2, 4-5, 10-11)  Employees in several departments have cited a tense work environment caused by Respondent's hostility toward the Union, and some have refused to participate in Board proceedings out of fear of retaliation. (Ex. F 3, 5; Ex. G 5)

Since March 16, 2017, Respondent has also increased security presence at the facility when the Union is present. (Ex. F 3-4; Ex. G 7)  While Union Representative Poulson has not been barred from Respondent's cafeteria and other public spaces, she has noticed security guards appearing to record her, gesturing to her that she is being watched, and pacing in front of the

cafeteria while she has met with employees. (Ex. F 3-4; Ex. G 7)  Respondent's managers have prevented her from speaking with unit members, and bargaining unit members have asked Poulson if it was legal for her to be at the facility.  (Ex. F 5; Ex. G 6, 8)

As noted, after March 24, Respondent has made unilateral changes to employees' working conditions, including changes to schedules, hiring new employees without posting the position to internal candidates, denying *Weingarten* rights, removing a health benefit plan, and eliminating a seven-minute grace period from Respondent's tardiness and attendance policy. (Ex. F 2, 4; Ex. G 4, 9, 11-13)  Whereas Poulson and employees previously were able to fight Respondent's efforts to make these changes, Respondent now denies Poulson's efforts, which makes the Union appear ineffective.  (Ex. F 7-8; Ex. G 8-9)  Employees who previously opposed the changes have since expressed reluctance to, and futility in, fighting such changes further given the Union's ineffectiveness. (Ex. F 7; Ex. G 9-11)

Injunctive relief requiring Respondent to recognize and bargain with the Union, including providing information necessary to permit the Union to bargain intelligently and formulate counterproposals, pending the Board's final decision also is crucial to preserve employee free choice. Respondent's continuing unfair labor practice and ongoing refusal to recognize and bargain with the Union will irreparably undermine employee selection of and support for the Union and will continue to negate the efficacy of the Board's final bargaining order.[16] Without

---

[16] *See, e.g., Brown v. Pac. Tel. & Tel.*, 218 F.2d 542, 544 (9th Cir. 1955) (withdrawal of recognition will cause "drifting away" of employee support for union); *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F.Supp.2d 1201, 1216 (E.D. Cal. 2010); *NLRB v. Irving Ready-Mix, Inc.*, 780 F.Supp.2d 747, 771-772 (N.D. Ind. 2011) ("The longer that Irving is able to avoid bargaining with the Union, the less likely the Union will be able to organize and represent Irving's employees effectively if and when the Board orders Irving to commence bargaining"), *aff'd* 653 F.3d 566 (7th Cir. 2011); *Kinney v. Cook Cnty. Sch. Bus, Inc.*, 2000 WL 748121 at *8-11 (N.D. Ill. 2000); *Pye v. YWCA of W. Mass.*, 419 F.Supp.2d 20, 22-23 (D. Mass. 2006); *Muffley v. APL Logistics Mgmt. Warehouse Serv., Inc.*, 2008 WL 54445 (W.D. Ky. 2008); *Moore-Duncan v. Horizon House Dev. Serv.*, 155 F.Supp.2d 390, 396-97 (E.D. Pa. 2001). *Cf. Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454-55 (1st Cir.

such an order, the employees' support for their chosen, Board-certified representative will predictably erode while the Union is unable to adequately protect them or affect their working conditions through collective-bargaining during the period the case is pending before the Board. *Avanti Health Sys.*, 661 F.3d at 1191 ("Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith claim, that failure to bargain will likely cause a myriad of irreparable harms").[17]

Indeed, many of Respondent's actions are those that by their very nature tend to cause alienation of employee support for an elected representative.[18] The Union is particularly vulnerable due to its position as a recently-certified representative seeking to bargain a first contract, which are two factors courts have found increase employees' susceptibility to misconduct undermining a representative by their employers.[19] In the present case, there is evidence that employee support for the Union has already begun to dissipate. Employee attendance at bargaining team meetings has fallen precipitously, and more employees are resigning from Union roles because they are unwilling to put targets on their back by supporting

---

1990) ("there was a very real danger that if Turabo continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees").

[17] *See also Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26-27 (1st Cir. 1986) ("[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining") and *Sacramento Coca-Cola Bottling Co.*, 733 F.Supp.2d at 1216 (same), both quoting *I.U.O.E. v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 950 (1970).

[18] *See Frankl v. HTH Corp.*, 693 F.3d 1051, 1066 (9th Cir. 2012) (unilateral change and "refusal to provide necessary financial information similarly show a failure to bargain in good faith, which 'has long been understood as causing an irreparable injury to union representation'").

[19] *See Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) ("The Union was only recently certified by the Board and the employees were bargaining for their first contract. These two facts make bargaining units highly susceptible to management misconduct").

the Union. Bargaining unit employees have decried the Union's ineffectiveness and inability to represent them in the workplace. Several prominent Union supporters have already left employment at Respondent or are actively looking for other employment because of the workplace environment created by Respondent's unlawful actions.

A final bargaining order issued by the Board, likely no less than a year from now, will be too late to protect employee choice reflected by the Board-conducted and certified election, and the Union will be unable to regain its lost support.[20] Predictably, the employees will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years since the election, and they will have little, if any, reason to support it.[21] However, an incumbent union needs the support of its employees in order to bargain effectively.[22] Thus, absent an interim bargaining order remedy, meaningful collective-bargaining after a Board decision will be impossible and the Board's final bargaining order will be a nullity.[23] This bargaining order must also include an order requiring Respondent to provide

---

[20] *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) (herein *Francisco Foods*) (the longer a union "is kept … from working on behalf of … employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining").

[21] *See HTH Corp.*, 650 F.3d at 1362 ("violations of Section 8(a)(5) [have] long been understood as likely causing irreparable injury to union representation"); *Stephen Dunn*, 241 F.3d at 669 ("[s]uccessful bargaining could restore the employees' interest in the Union").

[22] *See Avanti Health Sys.*, 661 F.3d at 1193; *Tiidee Products*, 426 F.2d at 1249 (employer "may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively").

[23] *See Horizon House Dev. Serv.*, 155 F.Supp.2d at 396-97 (without employee support, a union has little leverage and "will be hard-pressed to secure improvements in wages and benefits at the bargaining table"); *Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands … knowing that if the process breaks downs the union may be unable to muster enough votes to call a strike").

relevant information necessary for the Union to engage in meaningful bargaining.[24]  Further,

absent interim bargaining, the unit employees will also be deprived of any benefits of their

choice of Union representation pending the Board's decision; this is a loss that a Board order in

due course cannot remedy.[25]

### 2. Respondent's Discrimination Is Causing Irreparable Harm to Employees' Ability to Exercise Section 7 rights

Respondent's discriminatory treatment of a Union supporter and denial of employees'

*Weingarten* rights communicate to employees that Respondent will retaliate against them for

their Union protected activities, and that the Union will be unable to protect them.   Indeed,

employees have already stated they are discouraged from supporting the Union because they

reasonably believe it will result in discharge or discipline.[26] Thus, an order with respect to

Respondent's retaliatory conduct is necessary to reassure employees that they are free to support

the Union and exercise their Section 7 rights without fear of retaliation and to ensure an effective

final Board order. *See Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544 (4th Cir. 2009) (without

preliminary relief, many of the victims of the alleged discrimination would either retire or move

away in search of other employment).

---

[24] *See*, *e.g.*, *Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386, 394 (S.D.N.Y. 2003); *Pascarell v. Gitano Grp., Inc.*, 730 F.Supp. 616, 625 (D. N.J. 1990); *Zipp v. Bohn Heat Transfer Grp.*, 110 LRRM 3013, 3015 (C.D. Ill. 1982); *Scott v. Toyota of Berkeley, Inc.*, 106 LRRM 2070, 2075 (N.D. Cal. 1980); *Squillacote v. Generac Corp.*, 304 F.Supp. 435 (E.D. Wis. 1969).

[25] *See*, *e.g.*, *Avanti Health Sys.*, 661 F.3d at 1191-92; *Francisco Foods*, 276 F.3d at 299.

[26] *Cf. Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 501 (7th Cir. 2008) (employer's unlawful discrimination caused "precipitous decline" in union participation where employees stated they were hesitant to attend union meetings for fear of retaliation); *Abbey's Transp. Services, Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) ("[e]mployees are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs").

### C.      The Balance of Hardships Weighs in Favor of Relief

The harm to the employees' statutory rights, the employees' current support Union, and the Board's processes, outweighs any potential harms to Respondent.[27] There is evidence the Union has already lost employee support and the employees' choice of the Union will continue suffer irreparable harm absent interim relief while Respondent is able to achieve its unlawful objective of undermining the Union.[28]   Respondent, however, will suffer little, if any, harm if injunctive relief is granted, particularly since an interim bargaining order under Section 10(j) is not permanent.[29]

Such a bargaining order is necessary to protect the employees' selection of their bargaining representative, but will cause Respondent no substantial harm. The bargaining order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Rather, it only requires bargaining with the Union in good faith to an agreement or a bona fide impasse.[30] Furthermore, any agreement reached between Respondent and the Union under a Section 10(j) decree can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy.[31] Nor would the cost of collective bargaining in terms of time and money unfairly burden

---

[27]   *See McDermott v. Dura Art Stone, Inc.*, 298 F. Supp. 2d 905, 911–12 (C.D. Cal. 2003).  *See also Spartan Mining Co.*, 570 F.3d at 544 (employer failed to show it would be harmed by interim reinstatement of discriminatees); *Norelli v. Fremont-Rideout Health Grp.*, 632 F.Supp.2d 993, 1003 (E.D. Cal. 2009).

[28]   *See Electro-Voice, Inc.*, 83 F.3d at 1575 (absent injunctive relief "time works on the side of the employer-perpetrator to help him achieve his illegal purpose").

[29]   *See Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order … particularly an interim order which will last only until the final Board decision").

[30]   *See Overstreet v. Thomas Davis Med. Ctr.s, P.C.*, 9 F.Supp.2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers*, 88 F.Supp. 935, 943 (D. D.C. 1950).

[31]   *See*, *e.g.*, *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

Respondent, as those are costs borne by both parties and do not defeat a request for an interim bargaining order. *See Stephen Dunn*, 241 F.3d at 669.

### D.    The Public Interest Supports Enjoining Respondent's Conduct

The public interest in a Section 10(j) case "is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *HTH Corp.*, 650 F.3d at 1365, quoting *Miller*, 19 F.3d at 460. *See also Avanti Health Sys.*, 661 F.3d at 1197. Indeed, the Ninth Circuit recently recognized the need for an injunction where an employer unlawfully withdraws recognition. *HTH Corp.*, 650 F.3d at 1362. Furthermore, a strong showing of likelihood of success and of likely irreparable harm, as there is in this case, will establish that Section 10(j) relief is in the public interest. *Id.*at 1365.  Thus, the public interest would be best served by entry of an injunction to protect the employees' statutory rights and the Board's remedial authority.

## IV.    CONCLUSION

Based on the foregoing, it is respectfully submits that this Court should grant the relief prayed for herein.


DATED AT San Francisco, California, this 26th day of September, 2017.

/s/ Marta Novoa

MARTA NOVOA, Attorney for Petitioner
NATIONAL LABOR RELATIONS BOARD,
REGION 20
901 MARKET STREET, SUITE 400
SAN FRANCISCO, CA 94103